01
02
03
04
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES B. MILLER,                    )    CASE NO. C04-0671JCC
                                    )
        Petitioner,                 )
                                    )
   v.                               )
                                    )    REPORT AND RECOMMENDATION
JOSEPH LEHMAN, et al.,              )
                                    )
        Respondents.                )
_____)

        Petitioner proceeds with counsel in this 28 U.S.C. § 2254 habeas corpus action.  Petitioner
was convicted on June 9, 2000 of second-degree assault and sentenced to 45 months incarceration
and a 12 month term of community placement.  (Dkt. 17, Ex. 2.)  He was released from prison on
July 14, 2003 and began his community placement, which was to be completed on July 13, 2004.

        Petitioner contends he was denied his Sixth Amendment right to effective assistance of
counsel and enumerates nine different instances of his counsel's ineffectiveness.  (Dkt. 1.)  The
petition is now ripe for consideration.  Respondents filed an answer to the petition with relevant
portions of the state court record, including trial transcripts.  (Dkts. 14 & 17.)  Respondents argue
that petitioner failed to properly exhaust the bulk of his claims and that the remaining exhausted
claims lack merit.

        Petitioner moved to strike respondents' answer (Dkt. 20), submitted a traverse (Dkt. 19),
and filed a motion for leave to take the deposition of, and subpoena relevant records from, his

REPORT AND RECOMMENDATION
PAGE -1

01  former trial attorney.  (Dkt. 21.)  Within his traverse, petitioner rejected the contention that he

02  failed to exhaust any of his ineffective assistance of counsel claims, requested an evidentiary

03  hearing, and declined to address the merits of his claims prior to the Court ruling on his requests

04  for discovery and an evidentiary hearing.

05       The Court denied petitioner's motion to strike respondents' answer, requested a complete

06  response from petitioner as to the merits of his claims, and renoted petitioner's petition and

07  discovery motion for the Court's consideration.  (Dkt. 25.)  Petitioner subsequently submitted a

08  complete response as to the merits of his claims (Dkt. 26), to which respondents did not reply.

09  Respondents object to both petitioner's discovery request and his request for an evidentiary

10  hearing.  (Dkts. 14 & 23.)

11       The Court has considered the record relevant to the grounds raised in the petition,

12  including all hearing transcripts.  For the reasons discussed herein, it is recommended that

13  petitioner's habeas petition, along with his request for discovery and an evidentiary hearing, be

14  denied, and this action dismissed.

15                                              I

16       The Washington Court of Appeals summarized the facts surrounding petitioner's

17  conviction as follows:

18       The facts leading up to the assault [with a deadly weapon] were disputed at
         trial.  Miller's former friend, John Parezanin, testified that Miller was an alcoholic, and
19       that he had been trying to assist Miller with his problems.  On March 22, 1999,
         Parezanin learned that Miller had checked himself out of a hospital, and went to his
20       home.[1]  When Parezanin arrived that evening, Miller was so intoxicated that he
         urinated on himself.

21

22       Miller later fell asleep.  When he awoke at approximately 5:30 a.m., he
         attempted to leave and drive to a liquor store.  Believing that Miller was still
23       intoxicated, Parezanin would not let him leave.  Miller became angry.  He stated, "I
         am going to clean this up," and grabbed a shotgun.  He pumped a shell into the
24       chamber, and turned to aim the gun at Parezanin.  Parezanin testified that there was
         no doubt in his mind that Miller was going to shoot him.  Before Miller could point
25       the gun directly at him, Parezanin grabbed the gun away.  Parezanin hid the gun

26

         [1] Parezanin was accompanied by Alex Romero, who did not testify at trial.

REPORT AND RECOMMENDATION
PAGE -2

01  around the corner, and left.

02      Miller's story differed significantly. He testified that he had left the hospital
because he did not like the medication he was being given, and that he was still
03  sedated when he left.[2] He claimed that Parezanin did not arrive at his house until the
next morning, and that it was daylight when he arrived. Miller denied being an
04  alcoholic, and stated that he did not remember drinking that morning or the prior
evening.[3]

05
        Miller testified that Parezanin was upset about the way Miller was handling
06  his divorce, and began screaming at him as soon as he arrived. Miller asked Parezanin
to leave. When he refused, Miller started toward the door. According to Miller,
07  Parezanin grabbed a baseball bat, raised it over his head and told Miller that if he tried
to leave, he would do some "serious" damage to him. Miller was scared and wanted
08  to leave. He took his gun, and told Parezanin that he would make an opening for his
"egress." Miller admitted that he picked the gun up to create fear and apprehension
09  in Parezanin, and that the statements he made that night were intended to intimidate
Parezanin. He testified that it had "seemed like a good idea to blow a hole in the wall
10  and walk through it." But he also claimed that the gun was not loaded. Miller
testified that after Parezanin left, he locked the door and loaded his shotgun.

11
        The police arrived at Miller's home later that morning after being contacted
12  by Parezanin. Miller smelled of alcohol and urine. The police found Miller's gun,
which had a shotgun shell in the chamber. Miller was cooperative and responsive
13  during police questioning, and seemed intelligent and "sharp." Miller gave a
statement to the police, which differed from his trial testimony. He admitted to police
14  that the argument became heated because he had attempted to go out and buy a bottle
of wine. He stated that Parezanin threatened to crush his face if he left, but did not
15  mention a baseball bat. He told the police that he had picked up his shotgun and said
that he would make a hole big enough to walk through. He admitted to the police
16  that the gun had been loaded at the time.

17      At trial, Miller presented a lawful force defense. In closing argument, Miller's
counsel conceded that "[i]t's assault if he picks up the gun and does anything
18  threatening" and that a "shotgun displayed in a threatening manner is sufficient to
constitute assault two in the State of Washington . . . ." Miller was convicted as
19  charged and given a standard range sentence with a deadly weapon enhancement.

20  (Dkt. 17, Ex. 4. at 1-4.)

21      Miller appealed his conviction to the Washington Court of Appeals. (*Id.*, Ex. 3.) His

22  _____

23      [2] The defense did not produce testimony or other evidence as to what medication Miller
was taking, or any expert testimony about the effects of the medication.
24
        [3] Miller's girlfriend [(Pauline Oxford)] testified that she had been with Miller from
25  approximately 9:30 p.m. on the 22nd until 1:30 a.m. on the 23rd, that Miller had drunk only one
mixed drink and one glass of wine over the course of the entire night, and that he had no odor of
26  alcohol about him.

REPORT AND RECOMMENDATION
PAGE -3

01  counsel raised the following grounds for review:

02       1.    Should the jury verdict of guilty on this charge of second degree
03  assault be reversed where the defendant was in his own home, displayed but did not
point a gun at the "victim", and there is no direct evidence of a specific intent on the
part of the defendant to cause the "victim" fear or apprehension of imminent bodily
04  harm? (Assignment of Error #1)

05       2.    Did the defendant receive ineffective assistance of counsel where his
attorney (1) failed to present a case theory mandated by absence of evidence of an
06  essential element of second degree assault; (2) failed to assert a statutory defense to
the charge of assault in the second degree; (3) failed to raise the defense of diminished
07  capacity; (4) failed to present evidence of bias or motive on the part of the "victim";
and (5) misstated the law regarding assault during closing arguments and asserted that
08  the actions of the defendant did constitute assault?  (Assignment of Error #2)

09  (*Id*. at 2.)  The Washington Court of Appeals affirmed the conviction and sentence.  (*Id*., Ex. 4.)

10       Petitioner moved for reconsideration.  (*Id*., Ex. 5.)  He argued as follows:

11       The evidence in the record is insufficient to support a conviction for assault
in the second degree.  Properly presented, no rational jury could convict Mr. Miller
12  of that crime.  Mr. Miller's trial counsel failed in numerous aspects to provide a
minimally necessary defense to the crime of assault in the second degree.  This court
13  should reconsider its decision in light of the entire record, which contains numerous
failures by trial counsel, to prevent a gross injustice.

14

15  (*Id*. at 2-3.)  However, before the Court of Appeals could rule on his motion for reconsideration,

16  petitioner petitioned the Washington Supreme Court for review.  (*Id*., Ex. 6.)  His counsel raised

17  the following grounds for review:

18       1.    Was their [sic] insufficient evidence of the element of intent to cause
the victim to be placed in fear, such that it violates the Due Process Clause of the
19  Fourteenth Amendment to find the petitioner guilty of Assault in the Second degree?

20       2.    Was the petitioner's Sixth Amendment right to effective assistance of
counsel violated when, during closing argument, his trial attorney's [sic]  misstated
21  the elements of the crime charged and eliminated the specific intent element?

22       3.    Was the petitioner's Sixth Amendment right to effective assistance of
counsel violated by his trial attorney's failure to request instructions on, or to argue
23  the defenses of, voluntary intoxication and diminished capacity?

24       4.    Was the petitioner denied his constitutional right to effective assistance
of counsel on appeal when his appellate counsel failed to follow the correct procedure
25  for presenting evidence of facts outside the record, and attempted to raise claims of
ineffective assistance of counsel on direct appeal?

26

REPORT AND RECOMMENDATION
PAGE -4

01 (*Id.*)  The Washington Supreme Court denied his petition and, on May 13, 2002, the Washington

02 Court of Appeals issued its mandate.  (*Id.*, Exs. 7 & 8.)

03         On April 28, 2003, petitioner filed a personal restraint petition.  (*Id.*, Ex. 9.)  His counsel

04 raised the following grounds for review:

> 1.     Trial counsel's failure to object to police officer testimony that included hearsay statements from two witnesses, and the failure to object to the officer's testimony that he found these two witnesses to be credible, constituted a denial of the Sixth Amendment right to effective representation of counsel.

> 2.     Trial counsel's failure to offer the baseball bat in evidence to support his client's testimony and the theory of self-defense, constituted a denial of the Sixth Amendment right to effective representation of counsel.

> 3.     Trial counsel's failure to call Pauline Oxford as a rebuttal witness, to counter the prosecution's accusation that the defendant's testimony about a baseball bat was a recent fabrication, constituted a denial of the Sixth Amendment right to effective representation of counsel.

> 4.     Trial counsel's erroneous statement, that the defendant could not lawfully *offer* to use deadly force unless he had first been threatened with great bodily harm, was a misstatement of the law, and this misstatement constituted a denial of the Sixth Amendment right to effective representation of counsel.

> 5.     Trial counsel's failure to argue in closing that the defendant had the lawful right to use force to prevent an offense against his person, constituted a denial of the Sixth Amendment right to effective representation of counsel.

> 6.     Trial counsel's failure, to present evidence that the continuing effect of recently administered hospital medications reduced Miller's ability to think and perceive clearly, constituted a denial of the Sixth Amendment right to effective representation of counsel.

> 7.     The combination of trial counsel's failures and mistakes listed above, together with the deficiency previously recognized by the Court of Appeals on direct appeal (where the Court found that it was deficient conduct to misstate the law defining the crime of assault and thereby to relieve the State of its burden of proof on an element of the crime), had a cumulative effect of denying petitioner his Sixth Amendment right to effective representation of counsel.

23 (*Id.* at 15-17.)  The Washington Court of Appeals denied the petition.  (*Id.*, Ex. 10.)

24         Petitioner petitioned the Washington Supreme Court for review.  (    *Id.*, Ex. 11.)  His

25 counsel raised the following grounds for review:

> 1.     Did Judge Cox violate RAP 16.11(b) by dismissing a PRP which he

REPORT AND RECOMMENDATION
PAGE -5

had failed to find frivolous, instead of referring it to a three judge panel for a decision on the merits as the rule requires?

       2.     Did the failure to refer the PRP to a three judge panel deprive Miller of procedural due process?

       3.     Did Judge Cox commit obvious error when he concluded that Deputy Griffee's testimony was not hearsay, and that trial counsel's failure to object to it did not constitute ineffective assistance of counsel?

       4.     Did Judge Cox commit obvious error when he rejected Miller's claim that his trial attorney's failure to offer the baseball bat in evidence constituted ineffective assistance of counsel?

       5.     Did Judge Cox commit obvious error by failing to address Miller's claim that his trial attorney's failure to call Pauline Oxford as a witness constituted ineffective assistance of counsel?

       6.     Did Judge Cox commit obvious error in failing to address Miller's IAC claim that his trial attorney misstated the law of self-defense in closing?

       7.     Did Judge Cox commit obvious error in rejecting Miller's IAC claim that his attorney failed to investigate and to present evidence of the effects of medication withdrawal on his ability to form intent?

(*Id*. at 1-2.) The Washington Supreme Court denied review on March 19, 2004. (*Id*., Ex. 12.)

II

      Petitioner contends his conviction was contrary to his Sixth Amendment right to effective representation and identifies nine different acts or omissions of his trial counsel as constituting deficient and prejudicial conduct:

    (1)    Failure to object to the testimony of Deputy Griffee on the grounds that it included hearsay from two declarants;

    (2)    Failure to object to the testimony of Deputy Griffee that he found the statements made by the two hearsay declarants to be credible;

    (3)    Failure to offer in evidence as an exhibit at trial, the baseball bat used by witness John Parezanin, to illustrate why petitioner acted in self-defense;

    (4)    Failure to call Pauline Oxford as a rebuttal witness, to counter the prosecution's accusation that Miller's testimony about the baseball bat was a recent fabrication;

    (5)    Stating (erroneously) in closing argument that the defendant (Miller) could not lawfully *offer* to use deadly force unless he had first been threatened with

REPORT AND RECOMMENDATION
PAGE -6

01          great bodily harm;

02    (6)    Failing to state in closing argument that Miller had the lawful right to use
             force to prevent an offense against his person;

03
04    (7)    Failing to adequately investigate the possible defense of diminished capacity
             by failing to take the steps necessary to learn about the adverse side effects
             of the medication that Miller had been taking shortly before the alleged
05           criminal event;

06    (8)    Failing to present evidence that the continuing effect of recently administered
             hospital medications reduced Miller's ability to be able to think and perceive
07           clearly;

08    (9)    Stating (erroneously) in closing argument that the crime of assault was
             committed if Miller picked up a gun and did anything threatening, thereby
09           eliminating the element of intent to create fear or apprehension.

10   (Dkt. 1 at 5-6.)

11          Respondents assert that petitioner failed to properly exhaust and procedurally defaulted

12   all but his seventh, eighth, and ninth claims for relief and that, even if the Court found all of

13   petitioner's claims properly exhausted, those claims fail on the merits because petitioner's trial

14   counsel's performance was objectively reasonable.    The Court will address respondents'

15   exhaustion and procedural bar argument first.

16                                              III

17          "An application for a writ of habeas corpus on behalf of a person in custody pursuant to

18   the judgment of a State court shall not be granted unless it appears that . . . the applicant has

19   exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  To

20   exhaust state remedies, a petitioner must present each of his claims to the state's highest court.

21   *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1993).

22   A petitioner must "alert the state courts to the fact that he was asserting a claim under the United

23   States Constitution." *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (citing *Duncan v.*

24   *Henry*, 513 U.S. 364, 365-66 (1995)).  "The mere similarity between a claim of state and federal

25   error is insufficient to establish exhaustion." *Id.* (citing *Duncan*, 513 U.S. at 366).  "Moreover,

26   general appeals to broad constitutional principles, such as due process, equal protection, and the

01 right to a fair trial, are insufficient to establish exhaustion." *Id.* (citing *Gray v. Netherland*, 518

02 U.S. 152, 162-63 (1996)).

03 Pursuant to RCW 10.73.090, no petition or motion for collateral attack on a judgment and

04 sentence in a criminal case may be filed more than a year after the judgment becomes final.

05 Additionally, if the state court expressly declined to consider the merits of a ground based on an

06 independent and adequate state procedural rule, or if an unexhausted ground would now be barred

07 from consideration by the state court based on such a rule, a petitioner must demonstrate a

08 fundamental miscarriage of justice, or cause, *i.e.* some external objective factor that prevented

09 compliance with the procedural rule, and prejudice, *i.e.* that the claim has merit. *See Coleman v.*

10 *Thompson*, 501 U.S. 722, 735 n.1, 749-50 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989).

11 Respondents argue that, in failing to present them as the same claims, both factually and

12 legally, in both his federal habeas petition and his petition for review in the Washington Supreme

13 Court, petitioner failed to properly exhaust and procedurally defaulted all but his seventh, eighth,

14 and ninth claims for relief.  Respondents note that, while presenting these claims as federal

15 constitutional violations in his personal restraint petition, petitioner thereafter presented the claims

16 as errors of the Chief Judge of the Washington Court of Appeals in his petition for review before

17 the Washington Supreme Court.  (*See* Dkt. 17, Exs. 9 & 11.)

18 Petitioner disputes respondents' contention as to exhaustion.  He asserts that, while he

19 phrased his grounds for relief in terms of the standard for a motion for discretionary review before

20 the Washington Supreme Court, *see* Washington Rule of Appellate Procedure 13.5(b)

21 (considering whether the Court of Appeals committed "obvious error"), the substantive issues

22 remained the same as those presented in his personal restraint petition.

23 The Court finds all of petitioner's grounds for relief properly exhausted.  All of the claims

24 in petitioner's motion for discretionary review allege ineffective assistance of counsel (sometimes

25 shortened to "IAC") and/or reference *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the

26 case setting the standard for evaluating Sixth Amendment ineffective assistance of counsel claims.

REPORT AND RECOMMENDATION
PAGE -8

01 (*See* Dkt. 17, Ex. 11.)  The Court finds these references sufficient to put the Washington Supreme

02 Court on notice of the federal nature of petitioner's claims.  *See*, *e.g.*, *Sanders v. Ryder*, 342 F.3d

03 991, 999-1001 (9th Cir. 2003) ("[D]epending on the context of his claim, a prisoner may alert a

04 state court to the federal nature of the asserted right by using the phrase 'ineffective assistance of

05 counsel.'"; finding petitioner's repeated references to "ineffective assistance of counsel"

06 sufficient), *cert. denied sub nom. Moore v. Sanders*, ___ U.S. ___ , 124 S. Ct. 1661, 158 L. Ed.

07 2d 392 (2004).  As such, the Court must consider the merits of all of petitioner's ineffective

08 assistance of counsel claims.

09                                                              IV

10         As noted above, petitioner requests both discovery and an evidentiary hearing.  Although

11 petitioner maintains the need for an evidentiary hearing generally, this request appears primarily

12 related to his trial counsel's inaction with respect to a baseball bat allegedly wielded by John

13 Parezanin, and alleged failure to investigate and pursue a diminished capacity defense.  (*See* Dkt.

14 26 at 9, 26.)  Petitioner maintains the need for an evidentiary hearing so that the Court can assess

15 both his credibility and the credibility of witness Pauline Oxford, versus that of his trial counsel,

16 Michael Danko, on these issues.  In his discovery request, petitioner seeks to depose and obtain

17 documents from Danko.

18         Respondents argue that petitioner fails to show good cause for discovery and assert the

19 sufficiency of the records before the Court to determine petitioner's habeas claims.  Respondents

20 further argue that petitioner is not entitled to an evidentiary hearing given his failure to satisfy the

21 requirements of 28 U.S.C. § 2254(e)(2).  While disagreeing that reference to § 2254(e)(2) resolves

22 the issue, the Court agrees that neither discovery, nor an evidentiary hearing is appropriate in this

23 matter.

24         Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), state court

25 findings of fact are presumptively correct in federal habeas proceedings, and the petitioner bears

26 the burden of rebutting the presumption of correctness by clear and convincing evidence.  28

REPORT AND RECOMMENDATION
PAGE -9

01  U.S.C. § 2254(e)(1).  Pursuant to § 2254(e)(2), if the petitioner failed to develop the factual basis

02  of a claim in state court, the federal court may not hold an evidentiary hearing on that claim unless:

03      (A) the claim relies on –

04       (i) a new rule of constitutional law, made retroactive to cases on collateral review
    by the Supreme Court, that was previously unavailable; or

05

06       (ii) a factual predicate that could not have been previously discovered through the
    exercise of due diligence; and

07      (B) the facts underlying the claim would be sufficient to establish by clear and
    convincing evidence that but for constitutional error, no reasonable factfinder would

08      have found the applicant guilty of the underlying offense.

09  28 U.S.C. § 2254(e)(2).

10      Failure to develop a claim's factual basis in state court is not established unless there is a

11  lack of diligence, or some greater fault, attributable to the petitioner or his counsel.  *Williams v.*

12  *Taylor*, 529 U.S. 420, 437 (2000); *Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999).

13  A habeas petitioner has not failed to develop the factual basis of a claim where he was denied an

14  evidentiary hearing in state court.  *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997).  Here,

15  petitioner sought and was denied an evidentiary hearing in state court.  (*See* Dkt. 17, Exs. 9 & 10.)

16  As such, because petitioner cannot be said to have failed to develop the factual basis of his claims,

17  § 2254(e)(2) does not preclude an evidentiary hearing in this matter.

18      However, the mere fact that an evidentiary hearing is not precluded by § 2254(e)(2) does

19  not entitle petitioner to such a hearing.  *Downs v. Hoyt*, 232 F.3d 1031, 1041 (9th Cir. 2000);

20  *McDonald v. Johnson*, 139 F.3d 1056, 1059-60 (5th Cir. 1998).  Instead, the Court retains

21  discretion to determine whether an evidentiary hearing is appropriate or required under the pre-

22  AEDPA standard governing evidentiary hearings.  *Baja*, 187 F.3d at 1078.  *See also Downs*, 232

23  F.3d at 1041; *McDonald*, 139 F.3d at 1060.  Pursuant to that standard, a petitioner is entitled to

24  an evidentiary hearing where: (1) petitioner's allegations, if proven, would establish the right to

25  relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the

26  relevant facts.  *Jones*, 114 F.3d at 1010.  "[A]n evidentiary hearing is *not* required on issues that

REPORT AND RECOMMENDATION
PAGE -10

01 can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176

02 (9th Cir. 1998) ("It is axiomatic that when issues can be resolved with reference to the state court

03 record, an evidentiary hearing becomes nothing more than a futile exercise.")  "In determining

04 whether an evidentiary hearing is proper, the district court may expand the record and consider

05 affidavits, exhibits, or other materials that cast light on the merits of the petition." *McDonald*, 139

06 F.3d at 1060.

07       Following an independent review of the record, the Court concludes that an evidentiary

08 hearing is both unnecessary and inappropriate.  The issues in this case may be resolved by

09 reference to the state court record, which includes,  *inter alia*, a letter from Danko solicited by

10 petitioner's counsel and declarations from petitioner, Oxford, and a criminal defense attorney

11 rendering his opinion as to petitioner's claims, all of which petitioner submitted with his personal

12 restraint petition. (Dkt. 17, Exs. 9-9b, 10.)  Moreover, based on the entire record now before the

13 Court, including a declaration submitted by Danko elaborating upon the explanations in the letter

14 provided to the state courts (*Id.*, Ex. 13), the Court does not find that petitioner's allegations, if

15 proven, would establish his right to relief.

16       The Court likewise finds the requested discovery unnecessary.  Rule 6(a) of the Rules

17 Governing Section 2254 Cases provides that: "A party shall be entitled to invoke the processes

18 of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the

19 judge in the exercise of his discretion and for good cause shown grants leave to do so, but not

20 otherwise."  To show good cause, petitioner must set forth specific facts showing discovery is

21 appropriate. *Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d Cir. 1994) (citing *Mayberry v. Petsock*,

22 821 F.2d 179, 185 (3d Cir. 1987)).  Because the Court finds the record sufficient to determine

23 petitioner's right to habeas relief, it concludes that petitioner lacks good cause to conduct the

24 requested discovery.

25                                 V

26       This Court's review of the merits of petitioner's remaining claims is governed by 28 U.S.C.

REPORT AND RECOMMENDATION
PAGE -11

01 § 2254(d)(1).  Under that standard, the Court cannot grant a writ of habeas corpus unless a

02 petitioner demonstrates that he is in custody in violation of federal law and that the highest state

03 court decision rejecting his grounds was either "contrary to, or involved an unreasonable

04 application of, clearly established Federal law, as determined by the Supreme Court of the United

05 States." 28 U.S.C. § 2254(a) and (d)(1).  The Supreme Court holdings at the time of the state

06 court decision will provide the "definitive source of clearly established federal law[.]"  *Van Tran*

07 *v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir. 2000), *overruled in part on other grounds by Lockyer*

08 *v. Andrade*, 538 U.S. 63 (2003).   A state-court decision is contrary to clearly established

09 precedent if it "'applies a rule that contradicts the governing law set forth in'" a Supreme Court

10 decision, or "'confronts a set of facts that are materially indistinguishable'" from such a decision

11 and nevertheless arrives at a different result.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting

12 *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

13      Petitioner alleges ineffective assistance by Danko, his trial counsel.  The Sixth Amendment

14 guarantees a criminal defendant the right to effective assistance of counsel.  *Strickland*, 466 U.S.

15 at 687.  Courts evaluate claims of ineffective assistance of counsel under the two-prong test set

16 forth in *Strickland*.  Under that test, a defendant must prove that (1) counsel's performance fell

17 below an objective standard of reasonableness and (2) a reasonable probability exists that, but for

18 counsel's error, the result of the proceedings would have been different.  *Id*. at 687-694.

19      When considering the first prong of the *Strickland* test, judicial scrutiny must be highly

20 deferential.  *Id.* at 689.  There is a strong presumption that counsel's performance fell within the

21 wide range of reasonably effective assistance.  *Id*.  The Ninth Circuit has made clear that "'[a] fair

22 assessment of attorney performance requires that every effort be made to eliminate the distorting

23 effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

24 evaluate the conduct from counsel's perspective at the time.'"  *Campbell v. Wood*, 18 F.3d 662,

25 673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

26      The second prong of the *Strickland* test requires a showing of actual prejudice related to

REPORT AND RECOMMENDATION
PAGE -12

01  counsel's performance.  The reviewing court need not address both components of the inquiry if

02  an insufficient showing is made on one component. *Strickland*, 466 U.S. at 697.  Furthermore,

03  if both components are to be considered, there is no prescribed order in which to address them.

04  *Id*.

Testimony of Deputy Griffee

06      Petitioner's first and second grounds for relief relate to the testimony of Deputy Griffee,

07  one of the arresting officers.  Petitioner points to Danko's failure to object to this testimony as

08  including hearsay from two declarants, as well as the assertion that Deputy Griffee found the

09  statements of those declarants credible.

10      Deputy Griffee testified as follows:

11          We were called to a residence in the north part of Burien, the 1800 block of
12      26th Avenue Southwest, where we met with two men who told us that that [stet]
        another person had pointed a shotgun at one of them, and we took statements from
        them.  They seemed like credible witnesses and a victim to us.  And then we went to
13      the person's house where they said this had occurred, and we took that person into
        custody and recovered the shotgun.

14

15  (Dkt. 17, Ex. 15 at 4:13-22.)  Danko explained his failure to challenge Deputy Griffee's testimony

16  in the letter provided to the state courts:

17          After reviewing the transcript you recently provided, my recollection is clear
        about passing on an objection to opinion evidence.  While I no longer have the
18      discovery, I now recall the officer's report including his opinion.  As my cross-
        examination shows, I brought it up in order to capitalize on it.  Knowing my client
19      was going to testify, I wanted to bolster his credibility.  My cross was intended to
        show Mr. Miller was no less credible, having the officer acknowledge he did not know
20      any of the witnesses, was passing off an unfounded opinion, and that Mr. Miller, by
        being responsive and cooperative, should be deemed credible by the jury.

21

22  (*Id*., Exs. 9a & 18.)

23      In considering petitioner's claims as to this testimony, the Washington Court of Appeals

24  held:

25          Miller first contends that his trial attorney was ineffective for failing to object
        to the testimony of one of the arresting officers.  The officer testified that he
26      responded to a call and met two men who told him that a person (Miller) had pointed

REPORT AND RECOMMENDATION
PAGE -13

01      a shotgun at them.  The officer testified that he took statements from the two men, and noted that they seemed like credible witnesses.  The officer then testified that he
02  went to Miller's home, took him into custody, and took the shotgun from him.

03          Miller contends that his trial counsel was ineffective for failing to object to this testimony on two bases.  First, he contends that the officer's testimony contained
04  hearsay, in that he testified about what the men told him.  But it appears that the statement was not offered for the truth of the matter asserted.  Rather, the testimony
05  was offered to explain why the officer took the actions that he did.  The testimony was not hearsay, and Miller's trial counsel was not ineffective for failing to object to
06  the testimony.  Moreover, Miller is unable to demonstrate prejudice, as it was uncontested that Miller brandished a shotgun.

07
08          Miller also contends that his counsel was ineffective for failing to object to the testimony, arguing that the officer improperly vouched for the credibility of the
09  witnesses.  But the officer's comment was made in passing during a lengthy trial.  The decision not to object could reasonably be described as a legitimate trial tactic, as
10  objecting to the remark may well have simply drawn further attention to it.  Moreover, it cannot be said that this isolated remark made a difference in the trial.
    Miller has failed to demonstrate deficient performance or prejudice.

11

12  (*Id.*, Ex. 10.)  In denying discretionary review, the Washington Supreme Court noted petitioner's

13  argument that the Acting Chief Judge applied the wrong standard for determining prejudice and

14  stated: "But Mr. Miller does not persuasively show that the Acting Chief Judge applied a higher

15  standard, nor, in any event, does he convince me there is a reasonable probability that the errors

16  he complains of affected the outcome."  (*Id.*, Ex. 12.)

17          The Court finds the state courts' adjudication of these issues neither contrary to, nor

18  involving an unreasonable application of, clearly established federal law.  The Washington Court

19  of Appeals found Danko's failure to object to Deputy Griffee's statement regarding credibility a

20  legitimate tactical choice, a conclusion supported by Danko's letter.  "A reasonable tactical choice

21  . . . is immune from attack under *Strickland*."  *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir.

22  1997) (citing *Strickland*, 466 U.S. at 689-91).  Petitioner fails to demonstrate that such a tactical

23  choice fell below an objective standard of reasonableness.

24          Moreover, the state courts reasonably concluded that no prejudice resulted from Danko's

25  failure to object either on the basis of the credibility statement or on the grounds of hearsay.  As

26  noted by the Washington Court of Appeals, the fact that petitioner brandished a shotgun, as

REPORT AND RECOMMENDATION
PAGE -14

01 asserted by the two declarants, was never contested.  The Court further agrees that, given the

02 isolated nature of Deputy Griffee's credibility comment, it cannot be said that Danko's failure to

03 object prejudiced petitioner's case.  The relative insignificance of this comment is demonstrated

04 by Deputy Griffee's testimony on cross-examination that he had never met either declarant before

05 taking their statement, that he had nothing further at the time to verify the information they

06 provided, and his agreement that petitioner was "completely cooperative during the entire

07 contact[.]" (Dkt. 17, Ex. 15 at 13:15-14:13.)

08      Accordingly, for all of the reasons described above, the Court recommends that petitioner

09 be denied habeas relief as to his first and second grounds for relief.

10                                  Baseball Bat

11      Petitioner alleges Danko's ineffectiveness in failing to offer into evidence the baseball bat

12 allegedly used by John Parezanin, in order to support petitioner's claim of self defense.  Petitioner

13 also challenges Danko's failure to call Pauline Oxford as a rebuttal witness to counter the

14 prosecution's accusation that his testimony about the baseball bat was a recent fabrication.

15      In the letter supplied to the state courts, Danko stated:

16      The transcript also contains Mr. Parenazin's testimony.  You will note that he
        was not asked anything about a bat by the State or by me.  Mr. Miller, in his statement
17      to the police after his arrest did not include any reference to a bat.  Mr. Miller and I
        met a number of times prior to going to trial.  He had numerous other issues – his
18      DUI, business, family – as well as the Assault Two trial.  I do not recall when he first
        brought up the bat, but it was definitely after he had rejected the diminished capacity
19      defense.  At a subsequent meeting, I remember asking him about it again, and it was
        at that time that he told me he 'made it up' because it would be better for his self
20      defense claim.  I explained to him my ethical obligation prohibiting a proffer of false
        testimony.  The subject come [stet] up on other occasions, and my response remained
21      the same, and I told him that if he persisted, I would have to withdraw.  Shortly
        before trial, and again during trial and before he testified, we reviewed the testimony
22      and he acknowledged that the bat would not be brought up during his testimony.  I
        went over each part of his testimony carefully, knowing him as I did to easily get
23      unfocused.   The last conference occurred after Mr. Parezanin had testified.
        Obviously, if the evidence was credible, I surely would have presented it through Mr.
24      Miller, and I surely would have questioned Mr. Parezanin about it during cross-
        examination.  However, when I asked the question about anything in Mr. Parezanin's
25      hands, I expected the answer to be "no".  The next question to be asked then was one
        which would have elicited from Mr. Miller how easily Mr. Parezanin stepped over and
26      took the gun from his hands.  This would have been consistent with my opening

REPORT AND RECOMMENDATION
PAGE -15

01        statement and Mr. Miller's claim of not intending to assault anyone.

02  (Dkt. 17, Exs. 9a & 18.)  In declarations from petitioner and Oxford, petitioner denied fabricating

03  a story about the baseball bat and Oxford described meetings with petitioner and Danko in which

04  the bat was discussed, as well as the bat's presence in the back seat of petitioner's car on each day

05  of the trial.  (*Id.*, Ex. 9b.)

06        In dismissing petitioner's personal restraint petition as to these claims, the Washington

07  Court of Appeals held as follows:

> Miller next argues that his attorney was ineffective for failing to introduce into evidence a baseball bat with which Miller alleges the victim threatened him. According to Miller's trial counsel, he did not introduce the bat because Miller told him before trial that he had lied about the victim threatening him with a bat.  Miller denies this allegation.  Miller's counsel argues that this creates a factual dispute that should be resolved in a reference hearing.
>
> At trial, Miller testified on cross-examination that he acted in self-defense, and that his actions were reasonable because the victim had threatened him with a baseball bat.  In this petition, Miller contends that if his attorney had presented the alleged bat into evidence, this would have bolstered his case.  But even had a bat been admitted into evidence, this would not change the fact that he had not mentioned the bat to police earlier, that the police saw no bat at the scene, and that no other witnesses saw a bat.  And Miller fails to demonstrate that the alleged bat could be tied in any way to the victim, such as by fingerprints or the like.  Simply put, admission of a bat into evidence would not reasonably have made a difference at trial, particularly given Miller's earlier statements to police.

17  (*Id.*, Ex. 10.)  In denying petitioner's motion for discretionary review, the Commissioner of the

18  Supreme Court of Washington added:

> The next claimed error was counsel's failure to call a witness who purportedly would have testified that Miller told her about the bat and showed it to her several days after the incident.  But the Acting Chief Judge properly determined that failure to produce the bat did not prejudice Miller.  The witness's testimony similarly would not have proven that the victim actually wielded the bat.  While the witness's testimony might have served to rebut a claim that Mr. Miller recently fabricated the story of the bat, I am not persuaded that failure to call the witness prejudiced Mr. Miller.

24  (*Id.*, Ex. 12) (internal footnote omitted.)

25        The Court again finds the state courts' conclusions as to these claims neither contrary to,

26  nor involving an unreasonable application of, clearly established federal law.  As discussed below,

REPORT AND RECOMMENDATION
PAGE -16

01   the state courts appropriately focused on the absence of prejudice resulting from Danko's failure

02   to introduce the bat into evidence and/or to call Oxford as a rebuttal witness.

03        As noted by the Washington Court of Appeals, petitioner did not mention a baseball bat

04   in the statement he provided to the police:

05     At approximately 0700 am 3-23-99 there was a disagreement between myself, John
Parezanin and Alex Romero over the way I was handling my divorce *and alcoholism*.

06     [Italicized portion changed and initialed by petitioner.] The argument became heated
when I threatened to go out and buy a bottle of wine.  It turned into a screaming

07     match between the two of them against me.  John, who is a big fellow, blocked me
at the door, denying my egress.  He threatened that if I continued, he would cave my

08     face in or crush my head in.  I asked John and Alex to leave and they did not but
continued to argue *with me*.  [Italicized portion changed and initialed by petitioner.]

09     They didn't want me to leave because they thought that I was seriously going to go
out and buy alcohol.

10

11     John kept me back physically.  I walked across the living room [sic] and said theres
[sic] a real simple way to get out the front door.  I picked up the shotgun from behind

12     the fireplace and said I'll make a hole big enough where I can walk through.  The gun
had 4 or 5 shells.  While I was holding the shotgun, John took the shotgun away from

13     me.  [Initialed by petitioner.]

14     After taking the shotgun away from me, I walked out the front door and drove off.
I returned perhaps an hour later and they were not there.

15     John and Alex had permission to be at my home.  Alex stays there almost
continuously and John *was* a good friend.  [Italicized portion changed and initialed by

16     petitioner.]

17     I had nothing to drink this morning.  My last drink was approximately 10:00 pm last
night.

18

19   (*Id*., Ex. 19.)  Nor, as reflected in the statement, did petitioner mention the bat upon being given

20   the opportunity to make corrections.  On redirect, Deputy Griffee testified that he never saw,

21   discussed, or heard any discussion regarding a baseball bat, and that he would have taken any such

22   item into evidence had he been informed of its existence and relevance to the case.  (*Id*., Ex. 17

23   at 10:9-12:20.)  No other witness testified to seeing or hearing about a bat on the day of the

24   incident.  Therefore, whether or not Danko had produced the bat itself, the above described

25   evidence, or lack thereof, would have countered petitioner's contention that he acted in response

26   to Parezanin's wielding of a baseball bat.

REPORT AND RECOMMENDATION
PAGE -17

01          Likewise, given that she was not present at the time of the incident, additional testimony

02   from Oxford would not have supported the assertion that Parezanin actually had a baseball bat in

03   his hands.  Oxford had already testified that petitioner told her about the bat.  (   *Id.*, Ex. 16 at

04   69:22-25.)   However, during cross examination, Oxford did not dispute the assertion that

05   petitioner did not describe the events of that day to her until months after the incident had

06   occurred. (*Id.* at 67:8-69:25.)  As such, Oxford would have, at best, served to rebut only the

07   timing of the alleged fabrication.  Petitioner fails to support the contention that the lack of this

08   testimony prejudiced his case.

09          In sum, the Court concludes that neither the failure to produce the baseball bat, nor the

10   failure to call Oxford as a rebuttal witness prejudiced petitioner's case.  Accordingly, the Court

11   recommends that petitioner be denied habeas relief as to his third and fourth claims for relief.

12                                       Diminished Capacity

13          Petitioner alleges Danko failed to adequately investigate the possible defense of diminished

14   capacity based on the adverse side effects of various medications administered during petitioner's

15   hospital stay.  He further contests Danko's failure to present evidence that the continuing effect

16   of those medications reduced his ability to think and perceive clearly.

17          On direct review, the Washington Court of Appeals considered and rejected petitioner's

18   claim of ineffective assistance of counsel based on the failure to present a diminished capacity

19   defense:

20          Miller contends that his trial counsel's performance was deficient because he
     did not present a diminished capacity or voluntary intoxication defense, arguing that
21   both Parezanin and the arresting officers believed that Miller was intoxicated.  But
     Miller himself testified that he did not remember drinking, and his girlfriend testified
22   that he had only two drinks over the course of the evening.  Miller's counsel was not
     required to present a defense that was inconsistent with the testimony of the defense
23   witnesses.

24          Moreover, there was scant evidence to suggest that Miller's drinking affected
     his ability to form the requisite intent to commit the crime of assault in the second
25   degree.  Evidence of drinking is insufficient to warrant a voluntary intoxication
     defense instruction.  An instruction should only be given if there is "substantial
26   evidence of the effects of the alcohol on the defendant's mind or body."   State v.

REPORT AND RECOMMENDATION
PAGE -18

Gabryschak, 83 Wn. App. 249, 253, 921 P.2d 549 (1996), quoting Safeco Ins. Co. v. McGrath, 63 Wn. App. 170, 179, 817 P.2d 861 (1991). Here, although witnesses testified that Miller was intoxicated, the arresting officers also testified that he was responsive to questioning and seemed "sharp." Miller himself made no claim that he was unable to form intent. Rather, he testified that he picked up the gun to create fear and apprehension in Parezanin, and that he intended to intimidate Parezanin.

Miller also contends that his trial counsel was ineffective in failing to present a diminished capacity defense based on the fact that Miller had just been released from the hospital, where he had been given prescription drugs. The record below does not establish what drugs Miller was taking, or how those drugs may or may not have affected Miller's ability to form intent.

Miller has moved to supplement the record to include a letter from Dr. Sean Killoran concerning Miller's ability to form intent based on his consumption of prescription drugs. Although Miller cites to RAP 10.3(a)(7) as a basis for supplementing the record, that rule is inapplicable. A motion to supplement the record should properly be brought under RAP 9.11, which provides that the appellate court may direct that additional evidence be taken only if the following six conditions are met: (1) additional proof of facts is needed to fairly resolve the issues on review; (2) the additional evidence would probably change the decision being reviewed; (3) it is equitable to excuse a party's failure to present the evidence to the trial court; (4) the remedy available to a party through post judgment motions in the trial court is inadequate or unnecessarily expensive; (5) the appellate court's remedy of granting a new trial is inadequate or unnecessarily expensive; and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

The six criteria have not been met. In particular, if the letter were made part of the record, it would not probably change the decision being reviewed (factor 2). As a preliminary matter, the letter from Dr. Killoran is not competent evidence. The letter was not signed under oath, nor does the letter establish that Dr. Killoran is competent to render the opinions contained therein. Moreover, Dr. Killoran's letter indicates that Miller was hospitalized and given medications for alcohol withdrawal syndrome. Testimony about these medications would have contradicted Miller's claim that he did not have a problem with alcohol. It was not unreasonable for defense counsel to not put on evidence that would run contrary to his client's testimony and damage his client's credibility.

Moreover, the defense theory at trial was that Miller was reasonably defending himself against an attack by Parezanin. While self-defense and diminished capacity are not necessarily mutually exclusive defenses, it was not unreasonable for counsel to focus on one defense rather than presenting an alternate (and somewhat contradictory) theory. This is particularly so given that a diminished capacity defense was not supported by Miller's own version of events. We therefore deny Miller's motion to supplement the record, and hold that trial counsel was not ineffective for failing to present a diminished capacity defense.

(Dkt. 17, Ex. 4) (internal footnote omitted.)

In the letter submitted with petitioner's personal restraint petition, Danko stated:

REPORT AND RECOMMENDATION
PAGE -19

01        On the third question, as I tried to explain to you, Miller adamantly refused
to pursue the diminished capacity defense. I believed this was his best defense, and

02 told him very early in my representation of him that it could possibly lead to a
resolution without trial. Between his intoxication, the effects of medication mixed

03 with alcohol, and/or the withdrawal from medication and/or alcohol, and the
combination of any of these, I believed an expert would be able to testify that Mr.

04 Miller could not have formed the intent which was the gravamen of the charge. It
would have made it possible to defend him and keep him off the stand, and I had

05 grave reservations about his ability to testify on his own behalf and I discussed this
with him. However, Mr. Miller rejected it out of hand. He interpreted diminished

06 capacity as a personal attack on his intelligence and character. I did everything in my
power to explain the defense, and enlisted Ms. Oxford's assistance. All of my efforts

07 were to no avail, and I was forced to develop the theory presented at trial.

08 (*Id.*, Exs. 9a & 18.) By declaration, petitioner asserted that, after getting his signature on a

09 medical release form, Danko never discussed the effects of the medications petitioner received

10 during his hospitalization. ( *Id.*, Ex. 9b.) Also, Dr. Sean Killoran reiterated his opinion by

11 declaration, stating that, as a result of medications taken during the course of his hospitalization,

12 petitioner was "profoundly compromised . . . in his capacity to make and sustain prudent decisions

13 and intentions at the time of the charged offense." (*Id.*)

14        In considering petitioner's personal restraint petition, the Washington Court of Appeals

15 held as follows:

16        Next, Miller contends that his trial attorney was ineffective for failing to
present evidence, or to explore the possibility of presenting evidence, on the potential

17 negative effects of withdrawal from prescription medication on Miller's ability to think
clearly. The difficulty with this line of reasoning is that Miller was hospitalized and

18 given medication for alcohol withdrawal syndrome and significant liver damage. To
present evidence regarding the details of Miller's hospitalization and medication

19 would impeach Miller's testimony wherein he denied having an alcohol problem. As
noted in Miller's direct appeal, it was not unreasonable for Miller's trial counsel to fail

20 to put on evidence that would run contrary to his client's testimony and damage his
client's credibility.

21

22 (*Id.*, Ex. 10.)

23        The Court finds the state courts' adjudication of these issues neither contrary to, nor

24 involving an unreasonable application of, clearly established federal law. As noted by the

25 Washington Court of Appeals, a diminished capacity defense – in focusing on the reasons for

26 petitioner's hospitalization – would have contradicted petitioner's testimony that he was not an

REPORT AND RECOMMENDATION
PAGE -20

01  alcoholic.  (*Id.*, Ex. 16 at 116:19-118:19.)  (*See also id.* at 70:24-71:25 (although conceding

02  petitioner has a problem with alcohol, Oxford also testified that she did not believe petitioner was

03  an alcoholic)).  Given this contradiction, Danko's failure to present a diminished capacity defense

04  cannot be said to fall below an objective standard of reasonableness.  *See*, *e.g.*, *Bean v. Calderon*,

05  163 F.3d 1073, 1082 (9th Cir. 1998) (because a diminished capacity defense would have conflicted

06  with the primary defense theory presented, "'it was within the broad range of professionally

07  competent assistance'" for the trial attorney to not present that defense) (quoting *Correll v.*

08  *Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998)).

09          Moreover, the Court finds unavailing petitioner's contention that, at the very least,

10  Danko's failure to sufficiently investigate a diminished capacity defense constitutes deficient

11  performance.  It is undisputed that – as reflected in a letter from Danko seeking petitioner's

12  medical records, provided to the state courts by petitioner's counsel (Dkt. 17, Ex. 9a.) – Danko

13  undertook some investigation into petitioner's medical history.  Petitioner further concedes that

14  Danko was supplied with the requested records, which disclosed the medications petitioner

15  received during his hospitalization.  (*See* Dkt. 26 at 23-24.)  This evidence bolsters Danko's

16  assertion that he initially sought to pursue a diminished capacity defense.  Thereafter, once Danko

17  reasonably chose a defense theory, his duty to investigate a defense which would have

18  contradicted the theory chosen came to an end.  *See Bean*, 163 F.3d at 1082.

19          Petitioner fails to demonstrate that Danko's failure to further pursue and present a

20  diminished capacity defense fell below an objective standard of reasonableness.  As such, petitioner

21  should be denied habeas relief as to his seventh and eighth grounds for relief.

22                                    Closing Argument

23          Petitioner raises several ineffective assistance of counsel claims pertaining to Danko's

24  closing argument, including: (1) the erroneous statement that petitioner could not lawfully offer

25  to use deadly force unless he had first been threatened with great bodily harm; (2) the failure to

26  state that petitioner had the lawful right to use force to prevent an offense against his person; and

REPORT AND RECOMMENDATION
PAGE -21

01  (3) the erroneous statement that the crime of assault was committed if petitioner picked up a gun

02  and did anything threatening, thereby eliminating the element of intent to create fear or

03  apprehension.

04      In considering Danko's closing argument on direct appeal, the Washington Court of

05  Appeals stated as follows:

06          Finally, Miller argues that his trial counsel was ineffective in misstating the law
        in closing argument.  Miller's counsel stated that "[it is] assault if he picks up the gun
07      and does anything threatening."  He also stated that because Miller admitted wanting
        to intimidate Parezanin, "the issue here of intent is not significant . . ."  He conceded
08      that a "shotgun displayed in a threatening manner is sufficient to constitute assault
        two in the state of Washington in the law that's been give to you."

09

10          Because second degree assault requires proof of the specific intent to create
        fear or apprehension of bodily harm, Miller's counsel did misstate the law.  Viewing
11      the record as a whole, it is apparent that this was not a tactical decision, and indeed,
        we are unable to conceive of how misstating the law and relieving the State of its
12      burden of proof on a critical element of the charge could possibly amount to
        legitimate trial strategy.  We therefore conclude that counsel's performance was
13      deficient in this respect.

14          This does not end our inquiry.  Under the <u>Strickland</u> test, Miller must also
        demonstrate that he was prejudiced by his counsel's deficient performance.  To
15      demonstrate prejudice, a defendant must establish "that counsel's errors were so
        serious as to deprive [him] of a fair trial, a trial whose result is reliable."  <u>Strickland</u>,
16      466 U.S. at 687.  In order to prevail on his ineffective assistance of counsel claim,
        Miller must demonstrate that there is a probability that the jury's verdict would have
17      been different but for counsel's errors.  <u>State v. McFarland</u>, 127 Wn.2d 322, 334-35,
        89 P.2d 1251 (1995).

18          It is certainly possible that a jury would have reached a different result had
        counsel not misstated the law.  But we note that the jury was properly instructed on
19      the intent element and, as discussed above, there was ample evidence for a reasonable
        jury to conclude that Miller had the specific intent to create fear or apprehension of
20      bodily injury in Parezanin.  We are therefore unable to say that it is *probable* that a
        jury would have acquitted Miller had his counsel given a more compelling closing
21      argument.  Because Miller has failed to demonstrate a reasonable probability that a
        jury would have reached a different result had his counsel not misstated the law, he
22      has failed to demonstrate prejudice from his counsel's deficient performance.

23          Under certain limited circumstances, a criminal defendant may not be required
        to demonstrate prejudice to establish ineffective assistance of counsel.  For example,
24      in <u>United States v. Swanson</u>, 943 F.2d 1070 (9th Cir. 1991), the court held that no
        proof of prejudice was required when defense counsel repeatedly conceded that
25      prosecution had proved its case beyond a reasonable doubt.  But this exception to the
        <u>Strickland</u> prejudice requirement only applies when "counsel entirely fails to subject
26      the prosecution's case to adversarial testing."  <u>United States v. Cronic</u>, 466 U.S. 648,

REPORT AND RECOMMENDATION
PAGE -22

01   659, 104 S. Ct. 2039, 2047, 80 L. Ed. 2d 657 (1984). The <u>Strickland</u> standard
normally applies to ineffective assistance of counsel claims; <u>Cronic</u> only applies to the
02   narrow spectrum of cases where counsel's deficient performance amounts to an actual
or constructive complete denial of counsel. See, e.g., <u>Chadwick v. Green</u>, 740 F.2d
03   897, 900 (11th Cir. 1984); <u>Gochicoa v. Johnson</u>, 238 F.3d 278, 283 (5th Cir. 2000),
citing <u>Strickland</u>, 466 U.S. at 692-93.

04

05          Looking at the record as a whole, it is clear that Miller's counsel did not
altogether abandon his defense of Miller. Although he misstated the law in closing
argument, he also attempted to argue the alternate defense of lawful force. While his
06   performance was deficient, he did not completely fail to subject the State's case to
adversarial testing. Miller was therefore required to demonstrate prejudice. Because
07   he has failed to do so, his ineffective assistance claim fails.

08   (Dkt. 17, Ex. 4.) In later dismissing petitioner's personal restraint petition, the Washington Court

09   of Appeals stated as to this issue:

10          Miller also argues that his attorney was ineffective for misstating the law in his
closing argument. This precise issue was rejected in Miller's direct appeal. Miller has
11   not demonstrated that the ends of justice require that this claim be relitigated. [4]
Moreover, this claim is premised almost exclusively on the declaration of an "expert"
12   who opines that Miller's trial counsel misstated the law. "Since the determination of
whether an attorney erred raises a question of law, the opinions of expert witnesses
13   on the issues are irrelevant." <u>Halvorsen v. Ferguson</u>, 46 Wn. App. 708, 713, 735
P.2d 675 (1986) (quoting Ronald E. Mallen & Victor B. Levit, Legal Malpractice sec.
14   659, at 820-21 (2d ed. 1981) (footnotes omitted)).

15   (<i>Id.</i>, Ex. 10.) Finally, in denying petitioner's request for discretionary review, the Washington

16   Supreme Court found as follows:

17          On the question of defense counsel's closing argument, the Acting Chief Judge
determined that Mr. Miller's argument on this point had been rejected on direct
18   appeal. Mr. Miller contends the Acting Chief Judge was wrong. It does appear that
the claim Mr. Miller made in his petition is not precisely the same as the one he made
19   on direct appeal. In his appeal, Mr. Miller argued counsel was ineffective in
commenting that Mr. Miller would be guilty of assault if he picked up the shotgun and
20   did anything threatening with it. Here, Mr. Miller urges counsel erred in suggesting
Mr. Miller could not act in self-defense unless he was actually threatened with great
21   bodily harm. But even considering the merits, counsel did not explicitly say there
must be an "actual" threat of bodily harm. Mr. Miller concedes that the trial court
22   correctly instructed the jury on this point of law. He demonstrates neither error nor
prejudice.

23

24   (<i>Id.</i>, Ex. 12.)

25       [4] <u>See</u> <u>In re Barr</u>, 134 Wn.2d 868, 885, 952 P.2d 116 (1998) ("[I]n order to renew any
26   claim that was rejected on the merits on appeal, the [petitioner] must show that the ends of justice
would be served by reexamining the issue.")

REPORT AND RECOMMENDATION
PAGE -23

01          Again, the Court finds the state courts' resolution of these issues neither contrary to, nor

02   involving an unreasonable application of, clearly established federal law.  As discussed below,

03   petitioner fails to demonstrate any prejudice resulting from Danko's misstatement of the definition

04   of assault, nor any error or prejudice with respect to Danko's comments on the lawful use of

05   force.

06          The trial court instructed the jury that attorneys' remarks, statements, and arguments were

07   not evidence, and should be disregarded if not supported by the evidence or law as stated by the

08   court.  (*Id.*, Ex. 20.)  The trial court also provided proper instructions on the lawful use of force

09   and the elements of an assault.  (*Id.*)  The assault instruction properly included the element of

10   intent:

11          An assault is an act, with unlawful force, done with the intent to create in

12   another apprehension and fear of bodily injury and which in fact creates in another a
     reasonable apprehension and fear of bodily injury even though the act did not actually
     intend to inflict bodily injury.

13

14   (*Id.* (Instruction No. 6.))  The trial court also issued an appropriate lawful use of force instruction:

15          It is a defense to a charge of assault that the force used or offered to be used
     was lawful as defined in this instruction.

16

17          The use of or offer to use force upon or toward the person of another is lawful
     when used or offered by a person who reasonably believes that he is about to be
     injured in preventing or attempting to prevent an offense against the person and when
18   the force is not more than is necessary.

19          . . .

20   (*Id.* (Instruction No. 11.))  Additional instructions stated:

21          It is lawful for a person who is in a place where that person has a right to be
     and who has reasonable grounds for believing that he is being attacked to stand his
22   ground and defend against such attack by the use of lawful force.  The law does not
     impose a duty to retreat.

23

     . . .
24

25          A person is entitled to act on appearances in defending himself, if that person
     believes in good faith and on reasonable grounds that he is in actual danger of great
     bodily harm, although it afterwards might develop that the person was mistaken as to
26   the extent of the danger.  Actual danger is not necessary for the use of force to be

REPORT AND RECOMMENDATION
PAGE -24

01  lawful.

02  (*Id.* (Instruction Nos. 12 & 13.))

03       Petitioner admittedly brandished a shotgun and conceded that, in so doing, he intended to

04  create fear and apprehension on the part of Parezanin. ( *Id.*, Ex. 16 at 129:3-11 (petitioner

05  answered "That's correct" in response to the following question: "And in fact, the reason you

06  picked up the gun was to create fear and apprehension on the person blocking your egress, leaving

07  the house; isn't that right?"))   Taking this concession in conjunction with the jury instruction

08  proffered, the misstating of the definition of an assault by Danko cannot be said to have prejudiced

09  the outcome of petitioner's case.

10       After misstating the definition of assault, Danko focused his closing on petitioner's lawful

11  use of force.  (*Id.*, Ex. 17 at 37-41.)  He asserted that petitioner's use of force was lawful based

12  on the threat posed by Parezanin:

13            And there were the threats that he told Officer Massey, I forget exactly the
          words that he used, you'll have the exhibit, the business about denying my egress, he
14        threatened that if I continued he would cave my face in or crush my head in.

15        . . .

16            And again, yes, he didn't say there's a bat to the officer, but he does indicate
          that he was threatened, and it was not the threat of not being allowed out, the
17        crushing, that language in the statement, that is apparent to Mr. Miller, and it's the
          display at that particular time and the response to that threat that makes the use of the
18        shotgun, loaded or unloaded, lawful.

19        . . .

20            And the threats from Mr. Parezanin with the bat justifies what Mr. Miller did,
          and I ask that you do in fact find Mr. Miller not guilty based on his lawful act.

21

22  (*Id.* at 38:12-19, 40:19-25, and 41:19-21.)  Therefore, Danko did argue that petitioner had the

23  right to use force to prevent an offense against his person.  Petitioner argues Danko should have

24  also argued lawful use of force in preventing the offense of unlawful imprisonment.  However,

25  the Court does not find the omission of this additional argument objectively unreasonable given

26  Danko's focus on the use of force in response to the physical threat posed by Parezanin.

REPORT AND RECOMMENDATION
PAGE -25

01       Nor does the Court find performance below an objective standard of reasonableness or

02  prejudice stemming from Danko's comment as to great bodily harm.  As noted by the Washington

03  Supreme Court, Danko never stated that there must be an "actual" threat of bodily harm:

> To make sure that there isn't any confusion, the use of that shotgun as it was used
> must be in response to the threat of bodily harm, great bodily harm, those instructions.
> In my enthusiasm I, in fact, misstated, it's not the words themselves, it is that display,
> and I surely don't – I apologize for the error, as he's standing there.

07  (*Id.* at 40:12-18.)  As indicated, Danko was attempting to correct his earlier implication that

08  petitioner's use of force was lawful simply due to the fact that Parezanin said he would not allow

09  petitioner to leave the premises.  Considering this isolated comment in the context of the entirety

10  of Danko's closing argument and the jury instructions proffered, Danko's failure to clarify that

11  petitioner needed only to reasonably and in good faith fear great bodily harm was neither

12  objectively unreasonable, nor prejudicial.

13       In sum, the Court concludes that petitioner fails to demonstrate ineffective assistance of

14  counsel based on Danko's closing argument.  Therefore, the Court recommends that petitioner

15  be denied habeas relief as to his fifth, sixth, and ninth grounds for relief.

16  Cumulative Effect of Errors

17       Petitioner asserts that all of his trial counsel's errors should be analyzed together to

18  determine whether the cumulative effect deprived him of his right to effective assistance of

19  counsel.  *See Sanders*, 342 F.2d at 999 ("When we examine whether trial counsel gave effective

20  assistance, we examine all aspects of the counsel's performance at different stages, from pretrial

21  proceedings through trial and sentencing.  Separate errors by counsel at trial and at sentencing

22  should be analyzed together to see whether their cumulative effect deprived the defendant of his

23  right to effective assistance.") (citations omitted).  The Court clarifies that, considered individually

24  or cumulatively, for the various reasons described above, petitioner fails to establish ineffective

25  assistance of counsel.

26  / / /

REPORT AND RECOMMENDATION
PAGE -26

01

## VI

02      For the reasons described above, petitioner's habeas petition, as well as his request for an

03 evidentiary hearing and motion for discovery, should be denied, and this action dismissed.  A

04 proposed Order of Dismissal accompanies this Report and Recommendation.

05      DATED this  14th  day of October, 2004.

06                              s/ MARY ALICE THEILER
                                United States Magistrate Judge

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

REPORT AND RECOMMENDATION
PAGE -27